Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
5067 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

Shane T. Rowley (to seek admission pro hac vice)
Danielle Rowland Lindahl (to seek admission pro hac vice)
**ROWLEY LAW PLLC**
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Email: srowley@rowleylawpllc.com
    drl@rowleylawpllc.com

**ATTORNEYS FOR PLAINTIFFS**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STEVEN JONES, derivatively on behalf of HIMS & HERS HEALTH, INC.,**<br><br>   **Plaintiffs,**<br><br>  **v.**<br><br>**ANDREW DUDUM, DEBORAH AUTOR, PATRICK CARROLL, DELOS COSGROVE, ANJA MANUEL, CHRISTOPHER PAYNE, CHRISTIANE PENDARVIS, ANDREA PEREZ, KARE SCHULTZ, DAVID WELLS, YEMI OKUPE, MELISSA BAIRD, SOLEIL BOUGHTON, MICHAEL CHI, and IRENE BUCKLAND,**<br><br>   **Defendants,**<br><br>  **-and-** | **CASE NO. 3:25-cv-5866**<br><br>**JURY TRIAL DEMANDED**<br><br>**PLAINTIFF'S DERIVATIVE COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF:**<br><br>**(1) Breach of Fiduciary Duty (Derivatively Against the Director Defendants)**<br>**(2) Breach of Fiduciary Duty (Derivatively Against the Officer Defendants)**<br>**(3) Gross Mismanagement (Against All Defendants)** |

113936v1

| **HIMS & HERS HEALTH, INC.,**<br><br>**Nominal Defendant.** | **(4) Waste of Corporate Assets (Derivatively Against All Defendants)**<br>**(5) Unjust Enrichment (Derivatively Against the Officer Defendants)**<br>**(6) Insider Trading (Derivatively Against the Officer Defendants)**<br>**(7) Violation of Section 10(b) and Rule 10b-5 of the Exchange Act (Against All Defendants)**<br>**Violations of Section 20(a) of the Exchange Act (Against All Defendants)**<br>**(9) Contribution Under Sections 10(b) and 21D of the Exchange Act (Against Defendants Dudum and Okupe)** |
|---|---|

Plaintiff STEVEN JONES ("Plaintiff"), derivatively on behalf of HIMS & HERS HEALTH, INC. ("Hims" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, insider trading, and the federal securities laws. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Sookdeo v. Hims & Hers Health, Inc., et al.*, Case No. 3:25-cv-05315 (N.D.Cal.) and *Yaghsizian v. Hims & Hers Health, Inc., et al.*, Case No. 5:25-cv-05321-NW (N.D.Cal.); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

## NATURE OF THE ACTION

1.    This is a stockholder derivative action brought by Plaintiff, a stockholder of Hims, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers

occurring from at least April 29, 2025, to June 23, 2025 (the "Relevant Time Period"). During that time the Defendants (as defined herein) caused or allowed Hims to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2.    In May 2024, the Company began offering access to glucagon-like peptide-1 receptor agonists ("GLP-1s"), including compounded injectable semaglutide. GLP-1s help manage blood sugar, slow down digestion, and reduce hunger, making them effective treatments for diabetes and obesity. Ozempic and Wegovy, which use semaglutide, are U.S. Food and Drug Administration ("FDA") approved and branded GLP-1 treatments.

3.    When an FDA-approved drug is placed on the FDA's Drug Shortage List, other companies can produce compounded versions of the drug during the shortage. Ozempic and Wegovy were both placed on the FDA's Drug Shortage List, allowing Hims to manufacture and sell compounded semaglutide. However, the FDA removed semaglutide from the Drug Shortage List on February 21, 2025, limiting the Company's ability to sell compounded semaglutide.

4.    On April 29, 2025, Hims announced that it had entered into a collaboration with Novo Nordisk, the maker of Wegovy. The Company would be allowed to sell Wegovy through its platform and would work together to bring other Novo Nordisk treatments to customers through the Hims platform.

5.    The Company touted this collaboration in the weeks that followed. When questioned about Novo Nordisk's reaction to the continued sales of compounded semaglutide, the Company and Defendants downplayed any risk to the collaboration.

6.    On June 23, 2025, before the market opened, Novo Nordisk issued a press release announcing that it had decided to end its collaboration with Hims. The press release alleged that Hims had deceptively marketed illegal versions of

Wegovy and had continued to sell compounded semaglutide in violation of federal law.

7.    Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A.    Plaintiff

8.    Plaintiff Steven Jones is a current shareholder of Hims and has continuously held Hims stock during all times relevant hereto and is committed to retaining Hims shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of Hims and its shareholders in enforcing its rights.

### B.    Nominal Defendant

9.    Nominal Defendant Hims is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 2269 Chestnut Street, #523, San Francisco, California 94123. Hims common stock trades on the NYSE under the ticker symbol "HIMS."

### C.    Individual Defendants

10.    Defendant Andrew Dudum has served as Chairman of the Board, Chief Executive Officer, and a director of the Company since 2021. Defendant Dudum is a co-founder of Hims.

11.    Defendant Deborah Autor has been a director of the Company since November 2024.

12.    Defendant Patrick Carroll has served as the Company's Chief Medical Officer and has been a director of the Company since 2022.

13.    Defendant Delos Cosgrove has been a director of the Company since 2021.

14.     Defendant Anja Manuel has been a director of the Company since April 2024.

15.     Defendant Christopher Payne has been a director of the Company since March 2024.

16.     Defendant Christiane Pendarvis has been a director of the Company since 2023.

17.     Defendant Andrea Perez has been a director of the Company since 2021.

18.     Defendant Kare Schultz has been a director of the Company since July 2024.

19.     Defendant David Wells has been a director of the Company since 2021.

20.     Defendant Yemi Okupe has served as Chief Financial Officer of the Company since 2022.

21.     Defendant Melissa Baird served as the Company's Chief Operating Officer from 2021 until May 2025.

22.     Defendant Soleil Boughton has served as the Company's Chief Legal Officer since 2021.

23.     Defendant Michael Chi has served as the Company's Chief Commercial Officer since 2021.

24.     Defendant Irene Buckland serves as the Company's Principal Accounting Officer.

25.     Defendants Dudum, Autor, Carroll, Cosgrove, Manuel, Payne, Pendarvis, Perez, Schultz, and Wells are herein referred to as "Director Defendants."

26.     Defendants Dudum, Carroll, Okupe, Baird, Boughton, Chi, and Buckland are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 20(a), and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1, 78u-4(f), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

28.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

30.     Venue is proper in this court under 28 U.S.C. § 1391, because Hims is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### Company Background

31.     First launched in 2017, Hims provides customers with health and wellness products, including products prescribed by healthcare professionals. In 2024, Hims began offering injectable compounded semaglutide to its customers. The inclusion of semaglutide proved to be quite profitable for the Company. The Form 10-K filed with the SEC on February 24, 2025 (the "2025 Form 10-K") stated:

> We generated $1,437.9 million in Online Revenue for the year ended December 31, 2024, an increase of $595.6 million, or 71%, as compared to $842.4 million for the year ended December 31, 2023. Growth in Online Revenue for the year ended December 31, 2024 was driven by weight loss offerings launched in the fourth quarter of 2023 or later, including new offerings launched in the second quarter of 2024 for which there was no comparable revenue in 2023, as well as

continued sustainable growth in Subscribers pertaining to offerings available in all periods presented, from whom we generated recurring revenue. Offerings available in all periods presented represented a substantial majority of Online Revenue for the year ended December 31, 2024.

32.    The 2025 Form 10-K noted that the compounded semaglutide sold by the Company was subject to regulation by international, federal, and state authorities, including the FDA. According to the 2025 Form 10-K:

> Additionally, we rely on exemptions from FDA's premarket approval and certain labeling requirements to market our compounded products, which requires us to comply with the conditions in the exemptions set forth in Sections 503A and 503B of the FDCA. In May 2024, we began offering access to GLP-1s, first in the form of compounded injectable semaglutide and in August 2024 in the form of branded (or FDA-approved) injectable semaglutide, as part of our weight loss specialty, and in September 2024, we completed our acquisition of MedisourceRx, a licensed 503B compounding outsourcing facility. Certain compounding pharmacies and 503B outsourcing facilities have experienced both facility and product quality issues and been the subject of negative media coverage as well as litigation in recent years, including with respect to compounded GLP-1s. Compounding pharmacies and 503B outsourcing facilities have been subject to increased scrutiny of their compounding activities by the FDA and state governmental agencies. Governmental inquiries or actions or litigation brought against us, a Partner Pharmacy, Pharmacy, Facility, or Manufacturing Supplier relating to our compounding activities, including with respect to GLP-1 products, whether or not such inquiry, action or litigation ultimately results in penalties, changes to our business practices or other consequences, could have an adverse effect on our brand, reputation and business.

33.    The Company also stated in the 2025 Form 10-K: "Certain aspects of our GLP-1 compounding business are permitted by FDA based on current shortages of branded GLP-1s, and we cannot predict when such shortages will be resolved." The shortage of semaglutide was resolved on February 21, 2025, limiting the Company's ability to sell compounded semaglutide.

### D.    Hims's False and Misleading Statements

34.    From at least April 29, 2025, through June 23, 2025, Hims and its executive officers made materially false and misleading statements about the Company's collaboration with Novo Nordisk.

35.    On April 29, 2025, the Company announced that it would be collaborating with Novo Nordisk to offer Wegovy to Hims customers.  The press release issued that day stated:

**Hims & Hers and Novo Nordisk Team Up to Expand Affordable Access to Care**

April 29, 2025

*A bundled offering of Novo Nordisk's FDA-approved Wegovy® on the Hims & Hers platform marks the first step in a long-term collaboration roadmap, pairing innovative treatments with a leading care platform to elevate the impact of obesity care for today's consumer.*

SAN FRANCISCO--(BUSINESS WIRE)-- Hims & Hers Health, Inc. (NYSE: HIMS) today announced a long-term collaboration with Novo Nordisk designed to make proven obesity care and treatments more accessible, more affordable, and more connected for millions of Americans.

As a first step, Americans can now access NovoCare® Pharmacy directly through the Hims & Hers platform, with a bundled offering of all dose strengths of Wegovy® and a Hims & Hers membership, which includes access to 24/7 care, ongoing clinical support, and nutrition guidance, all in one place. At a single, unified price starting at 599 USD per month, individuals may be prescribed Wegovy®, alongside Hims & Hers' world-class, holistic approach to care, powered by today's technology. The offering is available this week on the Hims & Hers platform.

The companies are also developing a roadmap that combines Novo Nordisk's innovative treatments with Hims & Hers' ability to scale access to quality care, aiming to improve long-term outcomes for more people, more affordably.

"We're excited to work with Novo Nordisk, a company known for breakthrough innovation in clinical medicine and a strong portfolio of medications," said Andrew Dudum, CEO and founder of Hims & Hers. "Bringing our teams together and continuing to explore our shared commitment and focus on delivering the future of healthcare has been inspiring. We share a vision of what consumer-centered healthcare looks like, and this is just the first step towards delivering that future."

"We are pleased that Hims & Hers is making this offering available this week to people living with obesity," said Dave Moore, Executive Vice President, U.S. Operations and Global Business Development and President of Novo Nordisk Inc. "Beyond this initial collaboration, the companies are developing a roadmap that combines Novo Nordisk's innovative medications with Hims & Hers' ability to deliver access to quality care at scale, with the goal of improving long-term outcomes for more people living with chronic disease, and doing that

more affordably."

This new offering builds on Hims & Hers' existing suite of weight loss solutions and provides access to all dose strengths of Wegovy® in a high-quality pen for self-pay patients. The platform will continue to offer access to other medications, oral kits, protein, nutrition kits, and clinically-backed care plans, giving patients more ways to start and sustain their health journey based on their needs, goals, and eligibility.

36.    On May 5, 2025, the Company issued a press release announcing financial results for the first quarter of 2025.  According to the shareholder letter filed in a Form 8-K that day:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**We launched innovative partnerships that set the stage for greater consumer choice within our Weight Loss specialty, providing a blueprint for future specialties**

Enabling consumers to access a breadth of options has been a critical component of our strategy, and has allowed us to establish a leadership position across each of our specialties. Within our Weight Loss specialty, we recently brought more options to current and future subscribers. Oral medication kits and personalized compounded GLP-1s continue to serve our customers well, and with the launch of liraglutide at the end of March, our platform now offers access to the first generic GLP-1. This launch is already seeing early signs of success, providing subscribers previously taking commercially available dosages of semaglutide another option to transition to following the end of the semaglutide shortage.

Additionally, in April we announced a long-term collaboration with Novo Nordisk to expand affordable access to proven obesity care. As a first step, individuals can now access Wegovy® through the Hims & Hers platform, bundled with access to 24/7 care, clinical support, and nutrition guidance, all at a single, unified price. This collaboration pairs our customer-centric platform with Novo Nordisk's innovative pipeline, allowing us to serve more customers, broaden access to clinically proven treatments, and drive stronger outcomes. More importantly, beyond this initial launch, we are developing a broader roadmap together with Novo Nordisk, as well as a blueprint for future partnerships, to deliver access to quality care at scale, improve long-term outcomes for people living with chronic disease, and make care more affordable.



37.    Also on May 5, 2025, the Company released its financial results for the first quarter of 2025.  The Form 10-Q filed with the SEC that day stated:

We generated $576.4 million in Online Revenue for the three months ended March 31, 2025, an increase of $308.6 million, or 115%, as compared to $267.8 million for the three months ended March 31, 2024. Growth in Online Revenue for the three months ended March 31, 2025 was driven by: (i) new Subscriber growth pertaining to weight loss solutions launched in the fourth quarter of 2023 or later, including new Subscribers for compounded semaglutide glucagon-like peptide-1 receptor agonists ("GLP-1s") offerings launched in the second quarter of 2024 for which there was no comparable revenue for the three months ended March 31, 2024; and (ii) continued sustainable growth in Subscribers pertaining to offerings available in both periods, from whom we generated recurring revenue that was driven in part by ordinary-course marketing campaigns that continued to strengthen our mature offerings. During the three months ended March 31, 2025, our GLP-1 offerings generated approximately $230 million in Online Revenue, a significant majority of which came from personalized doses. New Subscriber growth in our GLP-1 offering was driven by both ordinary-course marketing campaigns as well as a specialized marketing campaign as discussed further below. Certain aspects of our GLP-1 compounded offerings were permitted by the Food and Drug Administration ("FDA") based on shortages of branded GLP-1s, which were affected by regulatory decisions during the first quarter of 2025 as further described below.

*    *    *

As described under Part II, Item 1A: "Risk Factors", on February 21, 2025, the FDA resolved the semaglutide shortage, which has constrained and is expected to continue to constrain our ability to continue providing access to compounded semaglutide on our platform. The FDA does not limit compounding to drug shortages, and we believe there are paths to continue offering access to certain compounded GLP-1s after the period of FDA enforcement discretion has ended following resolution of the shortage, consistent with the statutory exemptions from the new drug approval requirements. As such, we intend to continue expanding our weight loss offerings and serving our Subscribers with a wide range of weight loss solutions.

*    *    *

In May 2024, we began offering access to GLP-1s, first in the form of compounded injectable semaglutide and in August 2024 in the form of branded (or FDA-approved) injectable semaglutide, as part of our weight loss specialty, and in September 2024, we completed our acquisition of MedisourceRx, a licensed 503B compounding outsourcing facility. Certain compounding pharmacies and 503B outsourcing facilities have experienced both facility and product quality issues and been the subject of negative media coverage as well as litigation in recent years, including with respect to compounded GLP-1s. Compounding pharmacies and 503B outsourcing facilities have been subject to increased scrutiny of their compounding activities by the FDA and state governmental agencies. Governmental inquiries or actions or litigation brought against us, a Partner Pharmacy, Pharmacy, Facility, or Manufacturing Supplier relating to our compounding activities, including with respect to GLP-1 products,

whether or not such inquiry, action or litigation ultimately results in penalties, changes to our business practices or other consequences, could have an adverse effect on our brand, reputation and business.

Additionally, our compounded GLP-1 products are currently produced by 503B outsourcing facilities, which is permitted based on a previous shortage with respect to FDA-approved injectable semaglutide and FDA's determination that it would exercise enforcement discretion following its resolution of such shortage. On February 21, 2025, the FDA resolved the semaglutide shortage, which has constrained and could continue to constrain our ability to continue providing access to compounded semaglutide on our platform. The regulatory landscape applicable to GLP-1s continues to rapidly evolve in ways that may be adverse to our offering. While FDA does not limit compounding to drug shortages, and we believe there are paths to continue offering access to certain compounded GLP-1s after the period of FDA enforcement discretion has ended following resolution of the shortage consistent with the statutory exemptions from the new drug approval requirements, we cannot guarantee that we will be able to continue offering these products in the same manner, to the same extent, or at all, due to a variety of factors outside our control, including supply chain, intellectual property, regulatory and resource allocation matters. Further, in 2024, the manufacturers of certain FDA-approved GLP-1 products requested FDA add semaglutide and tirzepatide to its "Demonstrable Difficulties for Compounding List". FDA has never finalized the Demonstrable Difficulties for Compounding List for any drug products, but if FDA were to add semaglutide to, and finalize, the list, we could no longer compound these products. If our ability to offer these products continues to be constrained in the future, supply may be limited, the price of these offerings may increase significantly and the margins on our sale of such products may decrease, which could decrease new customer demand, cause existing customers to cancel their subscriptions, and reduce our revenues and/or gross profit from sales of such products, which could harm our brand, reputation, results of operations and the market price of our Class A common stock.

38.   That day, the Company held a conference call with investors and analysts to discuss the first quarter 2025 financial results. In connection with that call, Hims also released an investor presentation entitled "Investor Presentation: May 2025." As stated in the investor presentation:





39.    The investor presentation also touted the Company's transparency as to the GLP-1s it offered:





40. During the conference call, Defendant Dudum spoke on the collaboration with Novo Nordisk. In his opening remarks, Defendant Dudum stated:

Weight loss is another example that demonstrates how execution of our vision can translate into rapid scale. In just 18 months, it has become one of our largest specialties. We've added liraglutide earlier this year, and now through our new collaboration with Novo Nordisk, we're expanding access to branded Wegovy to bring subscribers on our platform, even broader range of choice. Branded Wegovy will be an additional option for subscribers and will complement our oral kit offering liraglutide and personalized semaglutide options.

Teaming up with Novo Nordisk is a pivotal milestone. We are pairing our customer-first platform with Novo's medicines, reaching more people and helping them stay on track with their goals. This collaboration also signals something important, trust from a major pharmaceutical leader, and it sets the blueprint for future partnerships that can expand both our reach and our relevance.

41. Defendant Okupe also spoke about the collaboration with Novo Nordisk and its expected impact on the Company:

Growth in the first quarter benefited from a unique opportunity to extend the reach of our platform to aid more than 100 million Americans impacted by obesity. Our platform empower our subscribers to pursue their goals with access to personalized solutions and tools customized for their unique journeys. We are excited to offer our weight loss subscribers access to an expanding portfolio of solutions with the start of a long-term collaboration with Novo Nordisk, one of the most respected companies in medical innovation. This collaboration combines our proven treatments with our ability to deliver personalized, tech-enabled care and services at scale.

In the near-term, this unlocks another compelling option for subscribers of commercially available dosages of semaglutide to transition to. It's a meaningful validation of our model and a powerful first step in expanding access to effective obesity care across the country. Together, these drivers, the momentum of our weight loss specialty and the continued adoption of premium personalized solutions, are creating tailwinds in subscriber engagement.

42. When asked to discuss the collaboration with Novo Nordisk and future implications of the collaboration, Defendant Dudum stated:

So, on the Novo side, this is a collaboration we're excited by. The teams across both organizations

have been spending quite a bit of time together, sharing meals and really aligning on what we think the future of healthcare looks like. And I think there's real excitement around that shared vision. So, when

I step back, I think there's a real set of opportunities hopefully across categories, across Novo product lines, potentially across geographies that we are brainstorming. And hopefully, in the coming quarters can give a little bit more precise road map with regard to what some of those offerings can be.

Generally, I think this type of a partnership, though, is a blueprint for what we think the next 5 and 10 years could look like across categories, right? There are incredible innovations happening in biotech. There are incredible innovations happening around diagnostic testing, preventative testing, and when we think about the platform that we have and the growing consumers that we are caring for, our ability to bring together a very disjointed set of players and broaden the ecosystem in a way where everybody really wins, I think it's something that uniquely Hims & Hers can do.

And so, this is an exciting first step with Novo and I think we're really looking forward to what can be possible in the next few years. And there's also, I think, a whole new avenue of opportunities across treatment types, across testing capabilities, across clinical providers where we can bring our ecosystem and theirs together on behalf of the consumer to ultimately be the curator of what we believe to be world-class healthcare.

43.    In response to a question about the Company's position on personalized dosages of semaglutide versus commercial dosages, Defendant Dudum stated:

And with regard to compounding and the personalization exemption, the rules are extremely straightforward and clear. So, we continue to expect the personalized semaglutide to exist on the platform. That's something we've shared as of last call, and it's something we shared earlier with Novo. But we also believe that the necessity of that should be limited to when providers feel that it's clinically needed and so the ability to do hyper-personalization for side effect mitigation, whether it's nausea, vomiting, muscle loss, et cetera is something that we continue to allow on the platform to continue to give providers that flexibility, the tools to make that type of personalization.

But generally, we think of it as relatively additive to the ecosystem because for the most part, these are patients that, frankly, just have not used commercial doses or a lot of them have actually tried the commercial dose and then have churned off due to the high side effect rate. And so, we think it's really additive as part of the mix.

And then when we step back, as Yemi said earlier, choice and selection on behalf of consumers all with regard to what they are clinically eligible for as well as from a regulatory perspective eligible for is what we believe is our duty, right, to push, to give them choice and options that work and ultimately to let them and the providers to choose the best outcomes.

44.    Defendant Dudum later was asked about the possibility of Novo Nordisk pulling out of the collaboration by an analyst from Deutsche Bank:

George Hill, Analyst, Deutsche Bank: Yeah, good afternoon, guys, and thanks for taking the question. I wanted to come back to Daniel's question about the relationship between Novo and HIMS. And I guess like there is kind of this natural tension between the dispensing of the personalized product and the commercial Wegovy that you guys are selling. So, was there any like interaction or any discussion around like a ratio of the dispensing of the personalized product versus the commercial product? And Andrew, I'd really be interested in the background, like, is there any risk that like Novo, whatever, pull the commercial relationship with you guys if personalized kind of sold too well, would just kind of love the background of the discussions around that.

Defendant Dudum: Yeah. Thanks, George. Yeah. Again, I think there is within both organizations a foundational appreciation for the fact that clinical decision making is truly independent. And I truly cannot emphasize enough, providers make decisions on our platform. We give providers and patients choices of treatments. And ultimately what is right for them is their own discretion. I think we strongly believe it's really important that we maintain that independence.

So this idea even of ratios and things of that sort of like that is business impacting clinical decision making in a way that is something we're definitely not comfortable with, nor do I think frankly any organization would be comfortable with because it's stepping on the toes of provider discretion.

So what we agreed to philosophically was what the regulation allow us for, right? And we made this very clear, we believe that personalized semaglutide is both clinically necessary for some patients because of the side effects that are very widespread and well-known, and that the regulation, under the compounding exemption, specifically under the personalized 503A, right? We're not talking about bulk manufacturing during a shortage, we're talking about personalization in the [ph] A (00:51:17) facilities that is regulatorily protected. So, I think there's an alignment that both the regulation allows for it. And we believe there's a need, whether or not there's total agreement with regard to how much of that should be available to what types of consumers. Will our organization ever align on that perfectly? Probably not. But I think the reality is and I think everybody is stepping back and realizing this reality is that we have millions of patients on Hims & Hers platform. We have 10,000 to 15,000 patients we're treating every single day. And they are looking for options.

And so in a world where great medicine is trying to find the patient that needs their option, it makes sense to work with Hims & Hers. And I think we have a responsibility to do that in the right way, to do it in a respectful way, to play by the book and to respect all parties, but I think that's where we as a distribution platform can really bring the ecosystem together, whether these players traditionally fight each other or compete with each other might not matter if ultimately, at the end of the day, we have millions of patients coming to us every day looking

for choice, and we want to make sure they have the broadest choice possible. That type of alignment is something that everybody I think can agree to, is something that benefits everybody. And I think as long as there is trust between all organizations that the way in which those patients receive care is independent and driven by clinical best practices, then I hope that we're able to have a really long and tenured relationship with many partners like this.

45.     On May 22, 2025, the Company issued a press release announcing more details about its collaboration with Novo Nordisk. As stated in the press release:

**Hims & Hers Introduces 6-Month Wegovy® New Customer Offer**

May 22, 2025

SAN FRANCISCO--(BUSINESS WIRE) -- Hims & Hers Health, Inc. (NYSE: HIMS) today announced eligible customers can access 6 months of prescription-only Wegovy® at a new, affordable price, making proven obesity care and treatments more accessible, more affordable, and more connected for millions of Americans.

"We are always looking for long-term, sustainable ways to increase access to care for our customers," said Andrew Dudum, CEO and co-founder of Hims & Hers. "This is another example of how we're working together with the industry to bring people closer to the care and treatments they need."

Starting today, new customers eligible for Wegovy® on the Hims & Hers platform can access their care for $549 per month for 6 months (for a limited-time only)1, ensuring customers have a longer window to access the affordable care they need. Included in that price is access to Hims & Hers' world-class, holistic approach to weight loss, powered by today's technology. Hims & Hers will continue to offer access to its full breadth of weight loss treatment options, including other medications, oral kits, protein, nutrition kits, and clinically-backed care plans, all of which help customers start and sustain their health journey based on their needs, goals, and eligibility.

46.     The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that the collaboration with Novo Nordisk hinged on the Company's continued sale of compounded semaglutide, and that the Company engaged in deceptive marketing to sell compounded semaglutide that was potentially made in an illegal manner.

**E.     The Truth is Revealed**

1    47.    On June 23, 2025, Novo Nordisk issued a press release announcing

2 that it had terminated its collaboration with Hims. As stated in the press release:

3    • **Novo Nordisk terminates collaboration with Hims & Hers Health, Inc. due to concerns about their illegal mass compounding and deceptive marketing**

4    • **Collaboration of over one month has ended based on Hims & Hers deceptive promotion and selling of illegitimate, knockoff versions of Wegovy® that put patient safety at risk**

5    • **Novo Nordisk won't stop taking action to protect Americans from the dangers of illicit foreign active pharmaceutical ingredients in knock-off drugs**

6    • **Efforts will continue to make authentic, FDA-approved Wegovy® directly available through NovoCare® Pharmacy to select telehealth organizations that share our commitment to safe and effective medical treatment for patients living with chronic diseases**

PLAINSBORO, N.J., June 23, 2025 /PRNewswire/ -- Novo Nordisk announced today that the company will no longer be working with Hims & Hers Health, Inc., and that direct access to Wegovy® will no longer be available to Hims & Hers Health, Inc. via NovoCare® Pharmacy.

In late April, the FDA resolved the Wegovy® shortage based on its conclusion that Novo Nordisk is fully meeting current and projected nationwide demand for this medicine. In support of transitioning patients from knock-off compounded versions to authentic, FDA-approved Wegovy® through NovoCare® Pharmacy, Novo Nordisk began collaborating with telehealth companies. Over one month into the collaboration, Hims & Hers Health, Inc. has failed to adhere to the law which prohibits mass sales of compounded drugs under the false guise of "personalization" and are disseminating deceptive marketing that put patient safety at risk.

"Novo Nordisk is firm on our position and protecting patients living with obesity. When patients are prescribed semaglutide treatments by their licensed healthcare professional or a telehealth provider, they are entitled to receive authentic, FDA-approved and regulated Wegovy®," said Dave Moore, Executive Vice President, US Operations of Novo Nordisk Inc. "We will work with telehealth companies to provide direct access to Wegovy® that share our commitment to patient safety – and when companies engage in illegal sham compounding that jeopardizes the health of Americans, we will continue to take action."

Novo Nordisk is deeply concerned and is continuing to take proactive measures to keep US patients safe from knock-off drugs made with foreign illicit active pharmaceutical ingredients. Based on Novo Nordisk's investigation, the "semaglutide" active pharmaceutical ingredients that are in the knock-off drugs sold by telehealth entities

and compounding pharmacies are manufactured by foreign suppliers in China. According to a report from the Brookings Institute, FDA has never authorized or approved the manufacturing processes used by any of these foreign suppliers to make semaglutide, nor has FDA ever reviewed or authorized the quality of the "semaglutide" they produce. The report also found that a "large share of [these Chinese suppliers] were never inspected by FDA, and many of those that were [inspected] had drug quality assurance violations." US patients should not be exposed to knock-off drugs made with unsafe and illicit foreign ingredients.

48.    On this news, the Company's stock dropped by more than 34%, closing at $41.98 per share on June 23, 2025, compared to a closing price of $64.22 on June 20, 2025.

49.    An analyst at Truist noted that the termination of the collaboration could damage the Company's long-term credibility. According to the analyst, "With the partnership seemingly over, we would anticipate a decline in traffic and adverse impact to Hims' compounding business." An analyst with Citi stated that the end of the collaboration would increase the Company's legal risks "substantially."

## F.    Insider Trading

50.    As the Company made false and misleading statements to investors about the ability to continue selling compounded semaglutide, certain Defendants sold millions of dollars of Hims stock. Defendant Dudum, for example, sold more than 508,000 shares of Hims stock during the Relevant Time Period, receiving proceeds of $27.1 million. The trades were described as being made pursuant to a Rule 10b5-1 trading plan. Defendant Okupe sold more than 46,000 shares of Hims stock during the Relevant Time Period, receiving proceeds of $2.4 million. The trades were described as being made pursuant to a Rule 10b5-1 trading plan.

51.    Other executive officers also sold shares of Hims stock during the Relevant Time Period. The Company's Chief Operating Officer, Defendant Baird, sold 33,333 shares of Hims stock and received $1.8 million in proceeds. Defendant

Chi, the Company's Chief Commercial Officer, sold over 27,600 shares of Hims stock, receiving proceeds of $1.6 million. Hims Chief Legal Officer, Defendant Boughton, sold more than 17,700 shares of Hims stock and received $922,776 in proceeds. And Defendant Buckland, the Company's Principal Accounting Officer, sold 13,556 shares of Hims stock and received proceeds of $778,328. All of the trades were described as being made pursuant to a Rule 10b5-1 trading plan.

### G.    Defendants' Misconduct Has and Continues to Harm the Company

52.    As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the securities class actions *Sookdeo v. Hims & Hers Health, Inc., et al*., Case No. 3:25-cv-05315 (N.D.Cal.) and *Yaghsizian v. Hims & Hers Health, Inc., et al.*, Case No. 5:25-cv-05321-NW (N.D.Cal.), as well as costs to be incurred in remediating deficiencies in the Company's internal controls. In addition, the Company's reputation and goodwill have also been damaged by the Defendants' misconduct.

### H.    The Board Breached its Fiduciary Duties

53.    As officers and/or directors of Hims, the Defendants owed Hims fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Hims in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Hims, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

54.    Defendants, because of their positions of control and authority as directors and/or officers of Hims, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-

traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Hims's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

55.    To discharge their duties, the officers and directors of Hims were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Hims were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)    Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d)    Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to

correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)    Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g)    Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

56.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

57.    The Board's Audit Committee is tasked with overseeing Hims's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Hims's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- Review, in general, earnings press releases, and review and discuss with management and the independent auditors' policies with respect to earnings press releases, shareholder letters and similar disclosures, and the type and presentation of information to be included therein (with particular attention to any use of "pro forma" or non-GAAP information), financial information and earnings guidance provided to the public, analysts, and rating agencies.

- Oversee the management of risks associated with the Company's financial reporting, accounting, and auditing matters, including the Company's guidelines and policies with respect to risk assessment and risk management.

58.    In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Manuel, Pendarvis, and Wells conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

59.    In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

60.    The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Hims.

## **DERIVATIVE ALLEGATIONS**

61.    Plaintiff brings this action derivatively in the right and for the benefit of Hims to redress injuries suffered by Hims as a direct result of the Director Defendants' breaches of fiduciary duty.  Hims is Himsd as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

62.    Plaintiff will adequately and fairly represent the interests of Hims in enforcing and prosecuting the Company's rights.

63.    Plaintiff was a stockholder of Hims at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Hims stockholder.

## DEMAND FUTILITY ALLEGATIONS

64.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

65.    The Hims Board currently has ten members: Defendants Dudum, Autor, Carroll, Cosgrove, Manuel, Payne, Pendarvis, Perez, Schultz, and Wells.

66.    Plaintiff has not made any demand on Hims's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

67.    The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

68.    The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Hims. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary

and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

**Demand is Excused as to Defendant Dudum**

69.    Defendant Dudum is the Company's co-founder and CEO. Defendant Dudum received compensation of $24.6 million in 2024. Defendant Dudum depends on Hims for his income. In addition, Hims stated in the Schedule 14A Proxy Statement filed with the SEC on April 25, 2025 (the "2025 Proxy"), that Defendant Dudum is not independent pursuant to NYSE rules.

70.    Defendant Dudum served as a director of the Company during the Relevant Time Period. As a director, Defendant Dudum had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Dudum was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

71.    Defendant Dudum failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Hims's controls, Defendant Dudum failed to protect corporate assets.

72.    Finally, Defendant Dudum is a named defendant in the securities class action cases. Thus, Defendant Dudum faces a substantial likelihood of liability.

**Demand is Excused as to Defendant Autor**

73.     Defendant Autor served as a director of the Company during the Relevant Time Period. As a director, Defendant Autor had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Autor was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

74.     Defendant Autor failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Hims's controls, Defendant Autor failed to protect corporate assets.

75.     According to the 2025 Proxy, Defendant Autor received $544,767 in compensation in connection with his role as a Company director. Included in that amount is $10,958 in fees earned by Defendant Autor in connection with a consulting agreement she has with Hims, although no other details of that agreement were disclosed. Accordingly, Defendant Autor cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

**Demand is Excused as to Defendant Carroll**

76.     Defendant Carroll is the Company's Chief Medical Officer. Defendant Carroll depends on Hims for his income. In addition, Hims stated in the Schedule 14A Proxy Statement filed with the SEC on April 25, 2025, that Defendant Caroll is not independent pursuant to NYSE rules.

77.     Defendant Caroll served as a director of the Company during the Relevant Time Period. As a director, Defendant Caroll had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Caroll was also required to act in

good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

78.    Defendant Caroll failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Hims's controls, Defendant Caroll failed to protect corporate assets.

**Demand is Excused as to Defendant Cosgrove**

79.    Defendant Cosgrove served as a director of the Company during the Relevant Time Period. As a director, Defendant Cosgrove had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Cosgrove was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

80.    Defendant Cosgrove failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Hims's controls, Defendant Cosgrove failed to protect corporate assets.

81.    According to the 2025 Proxy, Defendant Cosgrove received $199,357 in compensation in connection with his role as a Company director. Accordingly, Defendant Cosgrove cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

**Demand is Excused as to Defendant Manuel**

82.    Defendant Manuel served as a director of the Company during the Relevant Time Period. As a director, Defendant Manuel had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Manuel was also required to act in

good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

83.    Defendant Manuel failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Hims's controls, Defendant Manuel failed to protect corporate assets.

84.    According to the 2025 Proxy, Defendant Manuel received $563,524 in compensation in connection with her role as a Company director. Accordingly, Defendant Manuel cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

85.    Defendant Manuel served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for overseeing the Company's compliance with legal and regulatory requirements, review the Company's financial statements, and communications with investors, analysts and rating agencies. The Audit Committee was thus responsible for reviewing and approving Hims's Forms 10-Q filed on May 5, 2025. Defendant Manuel was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's collaboration with Novo Nordisk and the legality of its semaglutide compounding business. Defendant Manuel knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Manuel breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Manuel faces a substantial likelihood of liability for these breaches, making any demand on Defendant Manuel futile.

**Demand is Excused as to Defendant Payne**

86.    Defendant Payne served as a director of the Company during the Relevant Time Period. As a director, Defendant Payne had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and

financial statements were accurate. Defendant Payne was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

87.    Defendant Payne failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Hims's controls, Defendant Payne failed to protect corporate assets.

88.    According to the 2025 Proxy, Defendant Payne received $567,323 in compensation in connection with his role as a Company director. Accordingly, Defendant Payne cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

**Demand is Excused as to Defendant Pendarvis**

89.    Defendant Pendarvis served as a director of the Company during the Relevant Time Period. As a director, Defendant Pendarvis had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Pendarvis was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

90.    Defendant Pendarvis failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Hims's controls, Defendant Pendarvis failed to protect corporate assets.

91.    According to the 2025 Proxy, Defendant Pendarvis received $209,357 in compensation in connection with her role as a Company director. Accordingly, Defendant Pendarvis cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

92.    Defendant Pendarvis served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for overseeing the Company's compliance with legal and regulatory requirements, review the Company's financial statements, and communications with investors, analysts and rating agencies. The Audit Committee was thus responsible for reviewing and approving Hims's Forms 10-Q filed on May 5, 2025. Defendant Pendarvis was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's collaboration with Novo Nordisk and the legality of its semaglutide compounding business. Defendant Pendarvis knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Pendarvis breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Pendarvis faces a substantial likelihood of liability for these breaches, making any demand on Defendant Pendarvis futile.

### Demand is Excused as to Defendant Perez

93.    Defendant Perez served as a director of the Company during the Relevant Time Period. As a director, Defendant Perez had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Perez was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

94.    Defendant Perez failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Hims's controls, Defendant Perez failed to protect corporate assets.

95.    According to the 2025 Proxy, Defendant Perez received $214,357 in compensation in connection with her role as a Company director. Defendant Perez is not otherwise employed. Accordingly, Defendant Perez cannot reasonably and

1 objectively consider a demand to sue the Board that controls her continued
2 compensation.

**Demand is Excused as to Defendant Schultz**

4      96.    Defendant Schultz served as a director of the Company during the
5 Relevant Time Period. As a director, Defendant Schultz had a duty to ensure that
6 the Company's SEC filings, press releases, and other public statements and
7 presentations concerning its business, operations, prospects, internal controls, and
8 financial statements were accurate. Defendant Schultz was also required to act in
9 good faith and with due diligence to ensure that the Company's internal controls
10 were sufficiently robust and effective (and/or were being implemented effectively).

11      97.    Defendant Schultz failed to conduct oversight of the Company's
12 internal controls over financial reporting, or the Company's statements to
13 regulators, investors, and the public. By consciously disregarding the duty to
14 monitor Hims's controls, Defendant Schultz failed to protect corporate assets.

15      98.    According to the 2025 Proxy, Defendant Schultz received $483,740 in
16 compensation in connection with his role as a Company director. Defendant Schultz
17 is not otherwise employed. Accordingly, Defendant Schultz cannot reasonably and
18 objectively consider a demand to sue the Board that controls his continued
19 compensation.

**Demand is Excused as to Defendant Wells**

21      99.    Defendant Wells served as a director of the Company during the
22 Relevant Time Period. As a director, Defendant Wells had a duty to ensure that the
23 Company's SEC filings, press releases, and other public statements and
24 presentations concerning its business, operations, prospects, internal controls, and
25 financial statements were accurate. Defendant Wells was also required to act in
26 good faith and with due diligence to ensure that the Company's internal controls
27 were sufficiently robust and effective (and/or were being implemented effectively).

28

100. Defendant Wells failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Hims's controls, Defendant Wells failed to protect corporate assets.

101. According to the 2025 Proxy, Defendant Wells received $243,357 in compensation in connection with his role as a Company director. Defendant Wells is not otherwise employed. Accordingly, Defendant Wells cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

102. Defendant Wells served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for overseeing the Company's compliance with legal and regulatory requirements, review the Company's financial statements, and communications with investors, analysts and rating agencies. The Audit Committee was thus responsible for reviewing and approving Hims's Forms 10-Q filed on May 5, 2025. Defendant Wells was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's collaboration with Novo Nordisk and the legality of its semaglutide compounding business. Defendant Wells knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Wells breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Wells faces a substantial likelihood of liability for these breaches, making any demand on Defendant Wells futile.

103. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

## COUNT I

**Breach of Fiduciary Duty**

**(Derivatively Against The Director Defendants)**

104.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

105.   Each of the Director Defendants owed and owes Hims the highest obligations of loyalty, good faith, due care, and oversight.

106.   Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

107.   The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

108.   In addition, the Director Defendants further breached their fiduciary duties owed to Hims by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that the collaboration with Novo Nordisk hinged on the Company's continued sale of compounded semaglutide, and that the Company engaged in deceptive marketing to sell compounded semaglutide that was potentially made in an illegal manner. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

109.   The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants

had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

110.   As a direct and proximate result of the breaches of duty alleged herein, Hims has sustained and will sustain significant damages.

111.   As a result of the misconduct alleged herein, these Defendants are liable to the Company.

112.   Plaintiff, on behalf of Hims, has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty

### (Derivatively Against the Officer Defendants)

113.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

114.   The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Hims the highest obligations of loyalty, good faith, due care, oversight, and candor.

115.   The Officer Defendants breached their fiduciary duties owed to Hims by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that the collaboration with Novo Nordisk hinged on the Company's continued sale of compounded semaglutide, and that the Company engaged in deceptive marketing to

sell compounded semaglutide that was potentially made in an illegal manner.  The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

116.   As a direct and proximate result of the breaches of duty alleged herein, Hims has sustained and will sustain significant damages.

117.   As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

118.   Plaintiff, on behalf of Hims, has no adequate remedy at law.

## COUNT III

## Gross Mismanagement

## (Against All Defendants)

119.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

120.   By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

121.   As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

122.   As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Hims has sustained and will sustain significant damages.

123.   As a result of the misconduct alleged herein, the Defendants are liable to the Company.

124.   Plaintiff, on behalf of Hims, has no adequate remedy at law.

1
2
3

## COUNT IV

## Waste of Corporate Assets

## (Derivatively Against All Defendants)

4    125.  Plaintiff incorporates each and every allegation set forth above as if

5    fully set forth herein.

6    126.  The wrongful conduct alleged regarding the issuance of false and

7    misleading statements was continuous, connected, and on-going throughout the

8    Relevant Time Period. It resulted in continuous, connected, and ongoing harm to

9    the Company.

10    127.  As a result of the misconduct described above, the Defendants wasted

11    corporate assets by, inter alia: (i) paying excessive compensation and bonuses to

12    certain of its executive officers; (ii) awarding self-interested stock options to certain

13    officers and directors; and (iii) incurring potentially millions of dollars of legal

14    liability and/or legal costs to defend Defendants' unlawful actions.

15    128.  As a direct and proximate result of the waste of corporate assets and

16    breaches of duty alleged herein, Hims has sustained significant damages.

17    129.  As a result of the misconduct alleged herein, the Defendants are liable

18    to the Company.

19    130.  Plaintiff, on behalf of Hims, has no adequate remedy at law.

20

## COUNT V

21

## Unjust Enrichment

22

## (Derivatively Against the Officer Defendants)

23    131.  Plaintiff incorporates each and every allegation set forth above as if

24    fully set forth herein.

25    132.  By their wrongful acts, violations of law, and false or misleading

26    statements or omissions of material fact that they caused to be made, the

27    Defendants were unjustly enriched at the expense of, and the detriment of, the

28    Company.

133.    The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

134.    Plaintiff, on behalf of Hims, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT VI

## Insider Trading

## (Derivatively Against the Officer Defendants)

135.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

136.    By reason of their fiduciary roles as officers of the Company, the Officer Defendants specifically owed the Company the highest obligations of due care, good faith and loyalty.

137.    As officers of the Company, the Officer Defendants were given access to material information about the Company that was not generally available to the public, namely, that the collaboration with Novo Nordisk hinged on the Company's continued sale of compounded semaglutide, and that the Company engaged in deceptive marketing to sell compounded semaglutide that was potentially made in an illegal manner.

138.    When the Officer Defendants sold their Hims stock, they were in possession of material, non-public information. The sales were made on the basis of such information and were material to the Officer Defendants.

139.  The use of the Company's material, non-public information for their own gain is a breach of the Officer Defendants' fiduciary duties to the Company.

140.  Plaintiff, on behalf of Hims, seeks restitution from the Officer Defendants, and seeks an order from this Court disgorging all profits obtained by the Officer Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT VII

## Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
## (Against All Defendants)

141.  Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

142.  During the Relevant Time Period, the Defendants engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

143.  The Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hims not misleading.

144.  The Defendants, as directors and officers of the Company, acted with scienter during the Relevant Time Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Defendants were therefore directly responsible for the scheme set forth

herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

145.   By virtue of the foregoing, the Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT VIII

### Violations of Section 20(a) of the Exchange Act

### (Against All Defendants)

146.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

147.   The Defendants, as directors and officers of the Company, were, at the time of the wrongs alleged herein, controlling persons of Hims and each of the officers and directors who nade the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Defendants had the power and influence, and exercised the same, to cause Hims to engage in the illegal conduct and practices complained of herein.

148.   Plaintiff, on behalf of Hims, has no adequate remedy at law.

## COUNT IX

### For Contribution Under Sections 10(b) and 21D of the Exchange Act

### (Against Defendants Dudum and Okupe)

149.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

150.   The conduct of Defendants Dudum and Okupe, as described herein, has exposed the Company to significant liability under various federal securities laws.

151.   Hims, along with Defendants Dudum and Okupe, are named as defendants in the related securities class actions that allege and assert claims arising under the federal securities laws. Hims is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

152.   If the Company is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Dudum and Okupe as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. Hims is entitled to contribution and indemnification from Defendants Dudum and Okupe in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

153.   As officers and directors, Defendants Dudum and Okupe had the power or ability to, and did, control or influence, either directly or indirectly, Hims's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

154.   Defendants Dudum and Okupe are liable under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

155.   Defendants Dudum and Okupe, through their misconduct, have damaged the Company and are liable to the Company for contribution.

156.   Plaintiff, on behalf of Hims, has no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of Hims and that Plaintiff is a proper and adequate representative of the Company;

B.   Against all of the Defendants and in favor of Hims for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.   Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.    Awarding Hims restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 14, 2025          By:    /s/ Francis J. "Casey" Flynn, Jr.

Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
5067 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

**ROWLEY LAW PLLC**
Shane T. Rowley (to seek admission pro hac vice)
Danielle Rowland Lindahl (to seek admission pro hac vice)
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Email: srowley@rowleylawpllc.com
       drl@rowleylawpllc.com

**ATTORNEYS FOR PLAINTIFFS**